The bill alleged that the plaintiff was formerly the slave of one Lattimore, who had permitted him to make money for himself, under which license he had accumulated about seven hundred dollars, in good notes, which for better security, under the law, he had taken payable to one Nolin, a White man; that Lattimore having died, the defendant had persuaded him to have the notes made payable to him, promising to act as his friend, and telling the plaintiff further that he intended to purchase him; that the plaintiff, relying upon his assurances, had the notes transferred as requested, and that during the same year the defendant purchased him; that in 1862 the defendant sold him to one Bedford; that since his Emancipation he has made demands upon the defendant for the notes or their proceeds, and the latter refuses to account for them, or pay him any part thereof; and that the defendant has collected all or a large part of such notes, partly since the Proclamation of President Lincoln, Emancipating slaves, and partly since the Emancipation of slaves by the ordinance of 1865. The prayer was for discovery and an account, and for other relief.
The defendant put in a general demurrer.
1. The emancipation of the plaintiff, remitted him proprio *Page 357 vigore, to his common law rights, and his remedies to enforce all contracts of imperfect obligation.
The common law makes every presumption in favor of freedom:
(1.) Examples: A Lord makes a deed to, or contract with, or sues his villein. By implication of law, these acts enfranchised him.
(2.) The policy of our National Government was in favor of freedom. Slave trade was piracy, and those engaged in it are declared to be the enemies of all mankind.
(3.) The disability to make a contract or sue was incidental and collateral to the state of slavery, of arbitrary policy, not of natural right. In other words slavery was not an extinction of his natural rights of property, but only a suspension of them, and when resumed by emancipation, spring up, and being revived shall have such a relation back as to validate contracts of imperfect obligation.
(4.) This view is supported by the analogies of the law.
(a.) An alien is made a denizen by letters patent, buys land and dies; a son born before denization cannot inherit, but one born after may; but if naturalized by Act of Parliament, a son born before, as well as after, may inherit.
(b.) A man attainted of treason — his inheritable blood is destroyed, but if he received a statute pardon, it is restored.
(c.) A man having good title comes into possession by a bad one; he is remitted to his good one.
(d.) A man marries an alien woman, sells his land and dies; the wife is naturalized; she is remitted to dower in the land held. Co. Lit. 33 a. Our own Courts lean as far as possible to the support of the slave. For example.
(1.) Haley v. Haley, Phil. Eq. 180 supports a devise and bequest to slaves.
(2.) Lea v. Brewer, 5 Jon. Eq. 379, refuses to assist the executor to recover the property of the slave, to benefit the masters' estate.
(3.) Barker v. Swain, 4 Jon. Eq. 220, refuses the aid of the Court to the claimants of the salve's money. *Page 358 
(4.) White v. Cline, 7 Jon. 174, allows the trustee for the benefit of the slave, to recover.
The cases show that the Court has never held that property of a slave acquired by consent of the owner, belongs to the master. The Court has been cautions in this, and properly so.
The doctrine of slavery here, is a modified form of the civil law of slavery.
By the Roman law, the master was the absolute owner of all the acquisitions of the slave, with one exception — the slave's "peculium" — this was a specified and limited amount of property he was allowed to hold for the comfort and convenience of his family.
It is in analogy to that "peculium," that our Court has refused to make an executor account for the acquisitions of slaves, made by the master's consent, or his own consent after the testator's death.
Our Courts then have not held that the gains of the slave are the property of the master, but have recognized this "peculium," so far at least as to give him, if not a legal right, yet a quasi legal right to it.
This "scintilla juris," so to speak, remains in the slave, is sufficient to feed his estate in the contract with the defendant, and remit him to his complete right and remedy, on his emancipation.
II. This I claim as the legitimate result of emancipation, unaided by other legislation. But our second position is, that the ordinance of the Constitutional Convention of 1868, ch. XIV, gives the plaintiff the right to recover in this action.
This ordinance is the will of the people in their sovereign capacity, and is not restricted by the Constitution of the State, but only by the limitations of the Constitution of the United States.
No limitation in the Constitution of the United States affects the case; unless it is that which forbids the State to make a law impairing contracts. *Page 359 
But this ordinance does not impair, but enforces the obligation of a contract.
The objection on the other side is that the contract was void, and could not be validated by an act or ordinance. But this Court in the case ofCooke v. Cooke, Phil. 583, held that a void marriage could be made valid by Act of the Legislature.
This case is supported by many authorities. Cooley on State. Limitations 372 to 378, and cases there cited. McCulloch v. State of Maryland, 4 Wheat 466; Balt. Susq. Rail Road v. Nesbit, et. al. 10 How. 395.
1. The contract between the plaintiff and defendant when made was void. The defendant as master, in law, was the owner of the choses in action and the money arising therefrom. Barker v. Swain, 4 Jon. Eq. 220; Lea v. Brown, 5 Jon. Eq. 370; White v. Kline 7 Jon. Law 174; Batten v. Faulk, 4 Jon. Law 233; McNamara v. Kevans, 2 Ire. 66.
2. The Ordinance of 1868, ch. 14, p. 53, undertakes to divest vested rights. It is against the provisions of both the old and the new Constitution. See sec. 4, Bill of Rights in old and sec. 8 in new.University v. Foy, 1 Mur. 58; Robertson v. Barfield, 2 Mur. 390; Hoke v.Henderson, 4 Dev. 1.
3. Retroactive legislation may affect remedies, but not rights. It cannot take property which the law has given to one, and confer it upon another,Hinton v. Hinton, Phil. 410.
The simple story in the plaintiff's bill strongly moves the conscience of the judge to give the relief which he seeks.
We are clearly of the opinion, that all the choses in action, which the defendant had received for and on account of the plaintiff, at any time, even when he was a slave, and which he held in hand at and after the time when the plaintiff was emancipated, were held in trust for the plaintiff. And for this the plaintiff is entitled to a discovery, and an account. *Page 360 
The demurrer is therefore overruled; for a demurrer bad as to part is bad as to the whole. Adams' Equity 335.
We do not think it necessary to decide now, at what time, and by what means, the plaintiff was emancipated. It will be proper, therefore, for the defendant to discover all the choses in action which he has received at any time, for and on account of the plaintiff, and all the money collected, and when, and of whom; for we purposely pretermit the decision of the question, how far the defendant may be liable for everything he received, while the plaintiff was the slave of persons other than himself — as whether, if he did not hold the funds as trustee for the slave, he did for the owner
of the slave; and whether the consent of the owner that the plaintiff might earn the funds in controversy, though imperfect at the time, will not, the same never having been withdrawn, enure to the benefit of the plaintiff, and be perfected with his emancipation, and his status as a citizen. Demurrer overruled. This will be certified, c.
PER CURIAM. Demurrer overruled.